Oral argument not to exceed 15 minutes. Mr. Marvin Karp for the appellant. Thank you. May the court please. This, uh, the issue raised by Jeffrey Parenteau's ancillary petitions is a relatively simple and straight forward, which is were the written  and the United States of America assignments of a interest in these M.K.P. insurance policies in the amount of $957,157 were they supported by a valid consideration? And if they were supported by a valid consideration the assignments were valid and made petitioner Jeffrey Parenteau a bona fide purchase of a value within the meaning of the forfeiture statute. Doesn't it depend on whether Jeffrey was reasonably without cause to believe that the policies were subject to forfeiture at the time of the assignments? Well, that's the second issue and I'll be happy to get right to that if the court Yeah, sure. I'm sorry. Go ahead. Get right to it. That issue with respect to whether or not he had sufficient cause to believe that the policies were subject to forfeiture as of the time of the assignment. Bear in mind the time of the assignment is January 2009. I thought it was dealt with rather squarely by Judge Watson a year before this particular ruling in denying I came to a different conclusion later. Yes, precisely. We go with his later decision then, right? Not his earlier one. The two results, they were essentially contradictory Right. He had more information before him when he made his second decision than he made his first decision. Well, that may be theoretically. How could he have had less? As a matter of fact, there was no information in addition. He was right the first time. Then he thought better of it. Well, the first time around he said, look, at this time in January 2009, what did Jeffrey Parenteau? He was a laborer. Works with a tool. What did he know? He knew that his stepfather had been indicted. For what? He had been indicted for interfering with the internal revenue investigation of a third party, Pam Cantry. Wasn't there some evidence that he took these assignments because he was concerned about whether he might lose them? No. None at all. None at all. Okay. And with respect to that, the judge pointed out, how could he possibly know at this time that these policies were in jeopardy when there was nothing said in the initial indictment issued in September 2009, 2008, excuse me, anything about policies, about forfeiture, about fraudulent conduct, or anything of that nature. Not such evidence was presented by the U.S. Attorney's Office at the hearing. The facts remained the same. He knew nothing. He, meaning Jeffrey Parenteau, that there was any possible criminal fraud. He knew nothing about forfeiture. He's dyslectic. The proffer letter to Jeffrey's counsel. I'm sorry? The proffer letter to Jeffrey's counsel. The proffer letter was a... Is that before or after the... The proffer letter was in December 2008. That is before the assignment. The proffer letter says... The knowledge in the proffer letter is attributed to him for purposes of this question. All right. Let's assume that is correct. Why isn't it correct? It is correct. It's presumed what was in that letter. Not a word about forfeiture. Not a word about things being... You'd have to notice a forfeiture if you know that financial transactions are being made with a property that... He knows? Jeffrey Parenteau knows that? I wouldn't know. He knows what's in the proffer letter. Huh? He knows what's in the proffer letter, doesn't he? The proffer letter says that Thomas Parenteau and Marcia Parenteau are under investigation. There's a grand jury investigation going on... Bank fraud, money laundering, tax evasion, filing false tax returns and obstruction of justice, right? Yeah, and where is... Your Honor, may I ask Judge Rogers, where is the word forfeiture in there? It's not in there, but does it have to be in there, the word forfeiture, in order for you... I think in order to... You can't sort of smell that there's a forfeiture coming and try to get your money out and then you're covered because no one's ever used the word forfeiture. And how does Jeffrey Parenteau know that? I don't know, but the judge thought that he did. It isn't actual knowledge either, isn't it information from which he could have known? Like what? What is the standard? It isn't actual knowledge, is it? Reasonably without cause to believe that the assets were subject to forfeiture. So, he's given a letter... But was he reasonably without cause to believe that the assets were subject to forfeiture when he knows that these assets are being used in these possible violations of numerous federal criminal laws? I guess I'm not asking a fact question, I'm saying why isn't that enough to know? I submit it is not. How does he know that? He knows that from the proffer, because the proffer says that. One sentence that says the purpose is that these people are under investigation, you are therefore going to come in and cooperate fully with the government. Which he did. Told them everything they wanted to know. That gives him some reason to know that this property might be subject to forfeiture. Not that he's on notice that a forfeiture is going to be issued, but he's on notice that this stuff might be forfeited. And that that takes him out of the category of people who are, whatever the statutory language is... Your Honor, I respectfully disagree. Why would he not reasonably? I'm sorry, Your Honor? Why would he not have reasonably known at that point? Well, Jeffrey Perrin... No, go ahead and answer Mike's question. I'm getting ready to jump on you. Alright, Judge. I'm giving you a chance to tell us why Judge Rogers is wrong. Alright, I'll be happy to answer. Jeffrey Perrin is a laborer. All he knows is suddenly his stepfather has been put in jail and there he's been for three months. The government comes to him and says okay to his attorney, says we want you to come in and cooperate. Here's a proffer letter. Here it is. Now go into the room and tell us everything you know. The first sentence in the letter states as essentially an introduction that your parents are under investigation for various things. Alright? Does it say it relates to these insurance policies owned by MKP? Does it say that the insurance policies owned by MKP may be subject to forfeiture? Not a word. Does it say that there is a grand jury investigation going on? One sentence says that. Well, he admitted at the ancillary hearing that he knew that the insurance premiums were paid for through houses and the money Thomas made. He said he knew that at the time of the proffer hearing. His testimony said that, Mr. Carb. Yes, but does that mean that he knows that there was fraud? Well, they said that he wasn't in debt, but he knew how he paid his bills. Does it mean that he knew that the policy No, let me finish. Sure, I'm sorry. He knew that they were looking into the insurance premiums and how they were paid. He knew that they were looking into his business, his dad's business practices, which had something to do through houses and things that his dad was involved, stepdad was involved in. He knew. He said he knew it. That's how we know. He knew an investigation was going on. Does that mean that he knew how the bills were being paid and they were doing it through the house, including the insurance premiums? He worked on these houses himself with the tools. But he also said that he knew that these insurance premiums were being paid through the houses. All right. Does that mean that he knew there was fraud being committed? Does he know? And let's take me one step further. We're sitting in this distinguished courtroom with learned judges, with lawyers of certain amount of experience. Do we know... I would suggest that you probably have a certain amount of experience. A little bit, but minimal and criminal. Do we know that because an investigation was going on that these insurance policies owned by MKP may be subject to forfeiture? Jeffrey Parenteau never heard the word forfeiture. He doesn't know what it means, what it's talked about. Does it mean that because of an investigation going on that everything is verboten at that particular time? If Jeffrey Parenteau... It's not subject to forfeiture. It's cause to believe that they're subject to forfeiture. I'm sorry? Subject to forfeiture. It's not subject to forfeiture. It's cause to believe that the policies were subject to forfeiture. So if you reasonably have the cause to believe, you don't even have to know what the word forfeiture means. Jeffrey Parenteau went into his pocket and produced $107,000 which he loaned to MKP in the fall of 2008 to enable MKP to pay premiums on the policies. MKP was essentially not doing anything at this point. Thomas Parenteau being incarcerated. He reached the money into his own pocket to enable MKP to pay for these premiums. Was he doing that with knowledge that that means that these policies are going to be forfeited to the government? He went and worked to enable assignments to be, excuse me, to arrange for the sale of these policies so the policies could be sold. He went and visited at the direction of the insurance agent, got on a plane, went up to Massachusetts and met with his step-grandfather in order to get permission so that the policies could be sold. Did they do all of this because Jeffrey Parenteau knew the policies were going to be forfeited? Why were they going through this amount of effort? When was this that he...I'm sorry? What period of time was this? When did he go and visit the grandfather? It was like December of 2008. He and his wife flew up there to do that in order to enable the arrangements to be made for attempts to be made to sell these particular policies and at that juncture he was advised by an attorney Jeff, help yourself, protect yourself, get an interest in these particular policies. Protect yourself from what? I'm sorry? Protect yourself from what? Protect yourself so that you're going to lose all, you won't lose all of this money. How are you going to lose it? Very simple. You recall that in 2006 he borrowed from a bank 800,000s of dollars, which he then turned over to MKP. His own house was put up as collateral. He owes that money today. Not a dime has been paid on the principal. You mean he's going to lose it because he owes it to someone else? I'm sorry? When you say he's in danger of losing it, what's causing the loss? Because it's in the possession of MKP. But they owe it to him and they'll pay him. Well, that's what he's trying to do. Right, but he can't because it's forfeiture, so why aren't those very words in admission that he's trying to keep it from being... How would he lose it? I'm sorry? How would he lose it? What did he need to protect himself from? That's my question. MKP is no longer doing business. The stepfather is incarcerated. He was arrested and put in the county jail and he's been there and then into prison ever since, since September 16, 2008. So you're suggesting that the fact that the father was in jail threatened his ability to get the money out of MKP? I'm saying there was no ability to get money from MKP because MKP is not doing business. MKP owes Jeffrey the money back. I assume we're clear on that. I'm not clear on that, but I'm trying to ask a question that doesn't depend on whether that's the case or not, which is whether he had noticed that if he was owed the money, he was liable to lose it because there might be a forfeiture. And all of the things you're saying now seem to suggest that he tried to get those assignments because he was afraid that the criminal proceedings having to do with the father who controlled MKP might lead to the fact that he wouldn't be able to get the money. It sounds like a layman's version of forfeiture. Well, I think it's an additional jump there that you're making, Your Honor. Why? It sounds logical. MKP is run, we agree, MKP is run by Thomas Parenteau. Thomas Parenteau is in jail. Thomas Parenteau is not making any money. MKP owes people money. It has creditors. Among these creditors are Jeffrey Parenteau. Jeffrey Parenteau is not needing to get his money back. His father is in jail. How is he going to get his money back? The attorney says to him, get an assignment of interest in those policies, and therefore if the policies are sold, or if your grandfather down the road happens... The short answer is he's going to lose it to other creditors, is what you're saying. What about the $878,000 Thomas gave Jeffrey right about the time of his indictment? Yes, it's actually $790,000, something like that. It's somewhere in that wage judgehood, yes. A week after Thomas Parenteau was arrested and incarcerated, Marsha Parenteau is Thomas' wife, came to Jeffrey and his wife and gave him a check in the amount of $793,000. This was like the 16th, excuse me, 22nd, I think, of September. I had it as $878,000. I mean, who's counting? Okay. We know it's up in that range or somewhere. I had it given by Thomas. When it came up, Marsha Parenteau came and gave them this check and said this is to return the money that Jeffrey had deposited with MKP back in 2006. The proceeds of the two loans that he took out from American Home Mortgage so that they could build this property home together. She gave it back to him. Jeffrey and Tresser, two young people, and to their credit, thought about this and said, wait, this isn't right. If we take this money, MKP's bank account will be down zilch. Nothing there. MKP has creditors, people who have owed money. It's not right for us to take our money first and let these people live totally without any recourse at all. So they concluded... But that was going to happen because MKP would take bankruptcy and they had a preferential transfer. I'm talking about two young people. All they knew was the money was if they took this money, there's no money left in that bank account. It is not right. We will give that money back so MKP can pay these other creditors and then they'll come to us. This is what they did. They gave the money back. And to their credit, they said, hey, this is wrong. You shouldn't have done that. It's your own fault. Jeffrey, you and Tresser, you stupid people. You shouldn't have given the money back. Well, they did give it back. Did Thomas ask them to give it back? I'm sorry? Did Thomas ask them to give it back? Did Thomas what? Ask them. To give it back. No. Not at all. They did this totally in their own volition. They felt this was the right thing to do. Then two more months go by and they realize Thomas is still in jail. We're not going to get our money at all. What are we going to do? And at this point, the proposal was made by the insurance agent that the policies be sold and that some money be realized. I'm pretty familiar with the facts. Do you have further questions? The... Where did they get the money to buy a home that would yield all that money, all that excess money to give to the... In the year 2004, Jeffrey, who had been living with his step parents, his mother and his step father, got married. And they bought this home. Most of the money to pay for that home, it was a very nice home, was advanced or loaned or given by MKP. It was something like $400,000. And they helped pay for that. And there's no question that was done. The property turned out, with improvements and stuff, even Jeffrey works with his hands, he's a tool, that they were able to persuade the American Home Mortgage that they should be...that the amount of original loan, which was with Countrywide, I believe, on the house should be...I'm sorry? Go ahead. The amount that had been obtained by American...been taken out by MKP, it should be replaced with a new loan in the amount of...I think it was like over a million dollars. And out of that a million dollars, it paid off the Countrywide loan, and the balance of the money was delivered to MKP, so that MKP and Jeffrey could build a luxury home out of which the profits would be shared between MKP and Jeffrey. In addition... And that didn't happen. I'm sorry? And that's...never did get to happen. And a matter of fact, within a month after that, he took out...he was able to get a second loan from American Home Mortgage in the amount... stands in my mind. So therefore, those loans are outstanding. And those principal's loans are still owed by Jeffrey today. How he's going to pay for it? No one can figure out, but there it is. He's the person who's on those loans to American Home Mortgage. They're perfectly legitimate loans. No one has questioned them otherwise. Now, monies were advanced to pay the mortgage because under the terms of the...interest. Because under the mortgage, principal was deferred for 10 years. Right. So they paid him like $6,000 a month. That was interest. That is right, whereas the aggregate amount of interest on those two loans was in excess of $10,000 a month. Out of that $10,000, $6,000 was paid over by MKP. So he paid the interest on those loans, $6,000 to MKP, $4,000 of his own pocket. But the principal remains since it's still there. You know, to my amazement, the district judge bought the government's argument in his decision and said, well, since he was getting paid these interests, you know, he's not owed any money. We said, judge, what about the principal? It's untouched. Thank you, counsel. I'm sorry, thank you. I guess I would start by noting...I'm sorry. Hello again, Mary Beth. Go ahead. I guess I would start by noting that the district court had presided over a 30-day trial, heard this ancillary hearing evidence, and made basically factual findings that Jeffrey Parenteau was not reasonably without cause to believe that the property was subject to forfeiture. Also, that there were not that Jeffrey Parenteau had not established the existence of the antecedent loans that he claims formed the consideration for this assignment. And also that he had not established that there was not at least partial repayment of any loans that there were. This reasonable cause determination by the, or lack of reasonable cause, was a determination made by the district court? Yes. And that's enough to rule on this case if that determination is incorrect? Exactly. Both prongs would be required to find relief for Jeffrey Parenteau. Something strike you as unfair about having somebody pay the premiums for the asset that you're forfeiting and getting the proceeds of, and then just be left holding air? I'm not sure I understand your Honor's question. Well, he paid the premiums, right? He paid about $107,000 in premiums for those policies. That's debatable. The financial transactions between Tom Parenteau and MKP and Jeff and his company are unclear to say the least. He did make payments of the last couple of months of premiums, but there were simultaneous or near the same time money coming from MKP into Jeff's account. So, perhaps Your Honor, perhaps. Not nearly, of course, he had been paid over the years. He paid a couple of months at the end. Well, I mean, right, okay. But, I mean, there was evidence. He did loan money. He did give money to MKP for this venture that never happened, right? Yes, there was money that went to MKP. Right, and he mortgaged his house to get it. He did. So, it's not like there wasn't a real debt. The question is not whether Jeff Parenteau had a real debt to his mortgage company. The question is whether there was a loan with established terms that was an antecedent debt that could form consideration for this later assignment, and there's nothing in the record about the terms of any loan between Tom and Jeff at the time. Counsel has talked about the fact that Tom Parenteau was basically paying the interest on Jeff's mortgage, and that's true. He was paying the interest on Jeff's mortgage. But, there was no evidence that there was an agreement about what the interest would be on the loan between Jeff and Tom. This is all just an ex post recreation of the complicated financial back and forth. You know, sometimes that's what families do. Even completely law-abiding families. In such a situation, I think what you do is you look for the reality. You look for the concrete evidence. I mean, you look to see did he actually transfer that money to MKP? And then you say, yeah, there's something real there. There was real consideration that went in that direction. There was, but Tom Parenteau in 2004 had put a lot of money into the house. Then you come back to the issue of the repayment. At the time of the repayment, by which I mean the time when, and it is 878 Judge Hood, that's the 793 plus there was 85 the next day. So I had the same number. 878 went from MKP over to Jeff's account. And then they turned around and paid back, I think, 693 of that. And counsel has just said, Tom Parenteau was no part of that repayment. If there ever had been a loan, that had been paid back to Jeff at that point. The fact that he unilaterally for whatever reason decides to ship the money back over to MKP, you can't just create a loan with your one-sided action there. Well, okay, if you say you can't just create a loan with your one-sided action, well then you get it back. I mean, yeah, I can't give you a bunch of money and say, okay here's a loan, but then you give it back. You don't keep it and go, wasn't a loan. Well, no, you don't necessarily get it back because the question on this prong, which what we're now talking about is whether he's a bona fide purchaser for value. The question is when he took the assignment what was the consideration for it? And keep in mind he didn't just take one assignment. There was absolutely not any reasonable equivalence of value here because he took the full amount of the supposed loan on two policies. Tried to take it on four, but two of the insurers said no. So the full amount on two assignments on two of the policies. And the question there is not, you know, sort of a argue out some money. The question is, is there a debt, a valid antecedent debt that formed the consideration for this exchange? What if it had been like an investment? We give you the money on the hopes that it'll make more money, but we realize it might make less money. If it makes less, we won't get as much back, but if it makes more, we'll get more back and it's all kind of fuzzy how much that is. That's what it kind of looks like. That was the district court's understanding. That's not a loan. That's an investment. We don't call that a loan usually because you're sharing in the risk. Yes. But why does it have to be a loan in order to be a bona fide repayment? Why can't it be a bona fide return of capital without being a loan? You had no entitlement to the return of capital. I mean, in order for there to be a valid exchange, there had to have been a real entitlement to that antecedent debt. If it was just an investment that went wrong... It's not an investment if you don't... Look, if I give you $800,000 with the idea that you're going to go out and build a house and you don't build the house, then I haven't made an investment that when... You give me the money back. I mean, there was an agreement there. Okay, let's say you build the house and you lose money. That's one thing, but I don't think it's an answer to say he wasn't owed the money because his father was a crook. Well, and unfortunately a lot of that comes back to this. I mean, I think your perception that Jeff may have got left holding the bag here, he may have done, but that doesn't mean that the forfeiture A53 ancillary proceeding gives him a remedy for that. Judge White is asking thoughtful questions based on the idea that it wasn't an investment. I was asking questions based on the assumption for the moment that it was an investment. Let's assume just for the moment that it was something in the nature of an informal investment. So it's not a loan because if the investment goes bust, they don't owe you the money. But still, why wouldn't a return on investment, maybe even an early return on investment, you invested in this, but we're not going to go forward with it so we're giving all the money back. Why couldn't that serve as consideration for a bona fide transaction? I mean, do you see what I'm asking? If the terms of an investment agreement, for example, were established I know, but even so, even so with an informal agreement, he had the burden of proof. at the ancillary hearing and just offered nothing. I guess what I'm asking is does it really turn on whether it was a loan or not or does it turn instead on how vague the terms were regardless of whether it was a loan? Because you could have it be a return on investment which would not be a loan, but you're suggesting if all the dots had been crossed and the I's dotted, it might have been a basis for a bona fide transaction. Is it normally a loan would entitle you to repayment in a way that an investment would not, but it would be possible that you could have an agreement that you could establish as ancillary claimant entitled you to a return of investment. Perhaps in that situation, you could then argue that that could form the basis for a purchase in exchange for an assignment, but we're a long way from that here. And of course, none of that goes to the second prong, which is whether he had reasonable cause to believe the property was subject to forfeiture. And at least as of the time of the proffer agreement, it's clear that he should have, well, it's not should have, it's an objective standard. Whether or not he came to a realization and was aware of what forfeiture was, he had the information that gave him cause to believe the property was subject to forfeiture. Why would that? If there's something that's owned by a separate entity and you haven't indicted the separate entity, there's no mention of particular assets or, I mean, why would he know that these policies owned by another entity were subject to forfeiture? He was aware that they were, the premiums had been paid from the proceeds of the very business activity that was now being investigated. I mean, if you want to hypothesize that he was analyzing the state versus federal alter ego law questions, then perhaps he would have uncertainty about how that would come out. But cause to believe the property was subject to forfeiture, yes. And he did, the evidence was that the assignment was made to protect him and there was no question he was very involved in the business practice himself and the proffer was the month before the assignments. We have slippery benches up here. Are there other questions? We also have rogue mice. Rogue mice. Thank you. If you have nothing further and you have no further questions, we appreciate your argument. Yes sir, you have rebuttal time. First of all, you know, counsel says it's debatable that he even paid the money for the insurance premiums. The checks are put in evidence. The U.S. assistant to the U.S. attorney during Jeffrey Parenteau's misdemeanor sentencing hearing said, and this is in our brief, he said it's clear that Jeffrey advanced these money to pay the premiums for these policies that were seeking forfeiture. Jeffrey is entitled to a credit in any restitution order because of the money he paid. They admitted it. Counsel now says, well, but there were no formal documents. Step son and step father, the insurance agent says you need the money, Jeff, to put in so these policies stay in existence. He advanced the money. They said, well, there was no formal agreement on this. Okay, but he did get before he paid that premium, he did get a check for $107,000, which you say was to pay the American Express bill. That is right. That was a testimony. Was the American Express bill in? Did you present it? We put in as an exhibit in evidence the monies that were paid to American Express. Right, but not the bill. Not the bills themselves. No, we put in the exhibit itself. They were never challenged at all by the U.S. Attorney's Office that this was done. But the check was made out not to American Express. It was made out to the corporation. I don't remember that, frankly, Your Honor. I just don't remember it, but since they raised the question about this $107,000 the check was put into evidence with respect to that by the government, and so she testified to that. Judge Rogers raised a very valid point about an investment. As it happened, the district judge said, well, maybe what this was was a contribution to a joint venture when he put up the $800,000. He's putting up the $800,000 and the spec home is to be built. The spec home never got built. The joint venture never got off the ground. We submit that means he's entitled to get the money back, and everyone agreed he was entitled to get the money back. This wasn't a gift. He didn't borrow all this money on his home, which he is obligated to pay to American Mortgage to make a gift to MKP. He contributed the money for this prospective joint venture, and the fact is it didn't get built, and therefore he's entitled to get the money back. It clearly constituted valid consideration for the assignment, and that's simply our point. With respect to his cause to believe argument, I should have mentioned previously, and I apologize for doing so, even though it's in our brief, that the case law is that the cause to believe the property being subject to forture, it is not sufficient to say, hey, petitioner, you had cause to believe that some properties owned by Thomas Parenteau, or by MKP, or somebody else is subject to forfeiture. You have to know that this particular property, the policies were subject to forfeiture. Thank you, counsel. Thank you. Thank you. The case will be submitted, and that's all of our cases for today, so you may adjourn the court.